SUPERIOR COURT 
 
 OLIVIA DORRANCE v. AKG REALTY, LLC

 
 Docket:
 2184CV01069-C
 
 
 Dates:
 January 17, 2024
 
 
 Present:
 Robert B. Gordon
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT
 
 

       Presented for decision are Cross-Motions for Summary Judgment. For the reasons which follow, the Defendant's Motion for Summary Judgment shall be ALLOWED IN PART and DENIED IN PART, and the Plaintiff's Motion for Partial Summary Judgment shall be DENIED in its entirety.

FACTS

The evidence of record, summarized in the parties' Rule 9A(b)(5) Consolidated Statement of Undisputed Facts, establish the following relevant facts:
      
Plaintiff Olivia Dorrance ("Plaintiff' or "Ms. Dorrance" ) began renting an  apartment from Defendant AKG Realty, LLC ("AKG" or the "Defendant") in September of 2019. Ms. Dorrance rented this unit with a co-tenant, Third-Party Defendant Conor Lacey ("Lacey"), who jointly executed two successive leases for the apartment. The second of these leases was executed in March of 2020, and provided for a rental term to run from September 1, 2020

-1-

through August 31, 2021. Theodore Goldberg ("Mr. Goldberg'') is the manager of AKG, and personally handled all of the tenancy-related communications with Ms.Dorrance on behalf of this landlord.
      
Plaintiff and Lacey shared habitation of the AKG apartment from September 9, 2019 until May 30, 2020, at which time Lacey subjected Ms. Dorrance to serious domestic violence. Lacey was thereupon arrested, evicted from the apartment, and made subject to the strict terms of a G.L. c. 209A restraining order issued by the Boston Municipal Court. That restraining order compelled Lacey to stay away from both the AKG apartment building and Ms. Dorrance's workplace, and was extended for a full year after its initial issuance.
      
In early June, 2020, Ms. Dorrance apprised Mr. Goldberg of Lacey's criminal assault and the Chapter 209A restraining order that had issued against him. Mr. Goldberg then transmitted a series of messages, inquiring into Ms. Dorrance's intentions regarding the apartment. Specifically, on June 5, Mr. Goldberg asked whether Ms. Dorrance intended to find a new roommate; on June 8, Mr. Goldberg asked Ms. Dorrance if he should assume that she would be remaining in the apartment for the next 15 months (in accordance with the renewed lease whose term had not yet started to run); and on June IO, Mr. Goldberg emailed Ms. Dorrance to inform her that AKG had identified a potential replacement tenant for the unit if she was planning to quit her tenancy.
      
On June 12, 2020, Ms. Dorrance emailed Mr. Goldberg to express appreciation for his responsiveness, and at that time inquired if AKG might allow her to continue living in the unit at a reduced rent of $1000 per month. The rent so proposed was well less than half of Ms. Dorrance's existing occupancy rate of $2,375 per month. Mr. Goldberg replied that same day, stating that AKG would not be prepared to lower the apartment's rent in such a fashion, but

-2-

would be willing to re-list the unit in order to find a suitable replacement tenant if Ms. Dorrance were unable to carry the rent (either on her own or with a new roommate) prescribed by the existing lease agreement.
      
On or around June 24, 2020, Ms. Dorrance transmitted to Mr. Goldberg a sworn Certificate of Domestic Violence pursuant to the federal Violence Against Women Act. In that Certificate, Ms. Dorrance recited the details of the scarring episode of domestic abuse to which she had been subjected by Lacey. On June 25, Ms. Dorrance texted her sister in-law, telling her, "I' m doing pretty good right now. The apartment feels safe and positive. I've enjoyed just being alone and doing whatever O makes me happy." Ms. Dorrance further stated that she had spoken with a landlord-tenant lawyer and received guidance on how to assert her rights as a victim.
      
On July 21, 2020, Ms. Dorrance gave formal notice to AKG of her intent to vacate the apartment and terminate the parties' September 1, 2020 - August 21, 2021 lease in accordance with rights conferred by G.L. c. 186, § 24 (permitting a tenant to terminate a rental agreement or tenancy and quit the premises upon written notice to the landlord that a member of the household had been a victim of domestic violence or other enumerated offenses). Ms. Dorrance was at this point acting at the direction of a lawyer, and understood fully that she could not be compelled to make rent payments or pay related penalties for terminating a lease on account of the fact that she had been the victim of domestic violence in the subject apartment. Ms. Dorrance thus engaged in the following exchange with her sister, CW:

"CW: Did you ask to break the lease?

Dorrance: Oh yeah. My landlord is a fucking idiot. I am completely free of all this! He's just not listening to my lawyer.

CW: What arc you going to do?

Dorrance: My attorney will deal with it. I don't owe my landlord

-3-

anything despite what he thinks."

Between July 21 and August 21, 2020, Mr. Goldberg transmitted a series of messages to the Plaintiff in which he attempted to clarify Ms. Dorrance's continuing obligations to AKO under the tenns of her lease. Thus, on July 21, Mr. Goldberg advised Ms. Dorrance that "all monies/fees legally due" would have to be paid unless AKG were able to locate a suitable replacement tenant to mitigate its damages. Mr. Goldberg followed this communication with a text message on July 25, informing Ms. Dorrance that a replacement tenant had been identified but that Ms. Dorrance would in all events be responsible for paying a lease termination fee equal to one month's rent. On July 29, however, Mr. Goldberg advised Ms. Dorrance that the prospective tenant had backed out, and reminded her that his lawyer had stated that AKG was merely trying to do "a favor" for Ms. Dorrance because she had an executed lease. Ms. Dorrance replied by reiterating that she had given proper notice of her intent to terminate the lease, because her boyfriend had violently assaulted her in the apartment.

On August 8, 2020, Mr. Goldberg transmitted a text message to Ms. Dorrance, once again inquiring after her overdue rent payment. The record reflects no response from Ms. Dorrance to this missive.
      
On August 13, 2020, Mr. Goldberg informed Ms. Dorrance by email that a replacement tenant for the unit had been found, but that AKG had been forced to lower the rent by $200 per month in order to secure such cover. Mr. Goldberg further advised Ms. Dorrance that she would be expected to clear a $ 1000 deficiency under the existing lease, pay a one month's rent ($2,375) lease termination penalty, and cover $2,400 in unmitigable losses under the following year's lease as a result of AKG having to re-let the apartment at a reduced rental rate. Failing satisfaction of these obligations, AKG would authorize its attorney to pursue legal recourse.

-4-

On August 21, 2020, one month after Ms. Dorrance first asserted her intent to terminate her apartment lease pursuant to G.L. c. 186, § 24, AKG acknowledged that it would honor Ms. Dorrance's right to end the tenancy. Ms. Dorrance vacated the apartment on  August 31, 2020, and the record reflects that no penalties, fees or rent deficiencies were ever pursued or assessed against her. Ms. Dorrance thus suffered no adverse economic consequences from AKG's actions; but she nevertheless maintains that she experienced severe emotional distress and anxiety during the month-long period in which AKG asserted its intent to hold her accountable for the financial obligations due and owing under her prematurely terminated lease.

DISCUSSION

Plaintiff's Verified Complaint asserts five claims purporting to arise from the foregoing facts: (1) Violation of G.L. c. 186, § 24 (Termination of Rental Agreement by Victim of Domestic Violence); (2) Violation of G.L. c. 93, § 49 (Unfair Debt Collection); (3) Violation of G.L. c. 186, § 14 (Covenant of Quiet Enjoyment); (4) Violation of G.L. c. 93A, § 2 (Unfair and Deceptive Business Practices); and (5) Intentional Infliction of Emotional Distress. These claims are addressed in turn.

I. LEGAL STANDARD

"Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Helfman v. Northeastern  Univ.• 485 Mass. 308,314 (2020), quoting Godfrey  v.  Globe  Newspaper  Co.,  457  Mass.  113,  118-19 (2010). "The moving party bears the burden  of  demonstrating  the  absence of  a  triable issue of fact on every relevant issue.'' Scholz v. Delp, 473 Mass. 242, 249 (2015). The moving party may satisfy this burden by submitting affirmative evidence negating an essential element of the opposing party's case, or by demonstrating that the opposing party has no reasonable expectation

-5-

of proving an essential element of her case at trial. Flesner v. Technical Commc'ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, "the nonmoving party must respond and make specific allegations sufficient to establish a genuine issue of material fact." Barron Chiropractic & Rehab., P.C. v. Norfolk & Dedham Grp., 469 Mass. 800, 804 (2014). “Bare assertions made in the nonmoving party's opposition will not defeat a motion for summary judgment." Id. Accord Mass. R. Civ. P. 56(e) ("[A]n adverse party may not rest upon the mere allegations or denials of his pleading.").
      
"In deciding whether summary judgment is appropriate, a judge considers evidence presented in the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits." O'Connorv. Redstone, 452 Mass. 537,550 (2008), citing Mass. R. Civ. P. 56{c). The Court reviews the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility, or find facts. See Psychemedics Corp. v. Boston. 486 Mass. 724, 731 (2021); O'Connor, 452 Mass. at 550.

II. PLAINTIFF'S CLAIMS

1. Violation of G.L. c. 1867 § 24 (Count I)

In Count I of the Complaint, Plaintiff maintains that AKG violated G.L. c. I86, § 24. AKG is purported to have done this, first, by "discouraging" her termination of the lease through a failure to acknowledge her right to terminate the tenancy when discussing her options; and, second, by making demands for monetary payments associated with her lease termination during the month-long period between July 21 and August 21, 2020. For these claimed violations of the statute, Plaintiff seeks tort damages for resulting emotional distress she purports to have experienced.

-6-

G.L. c. 186, § 24(a), by its terms, grants tenants the right to ''terminate" a rental agreement or tenancy and quit the premises upon written notification to the owner that a member of the household is a victim of domestic violence ... if such notification is made within 3 months of the most recent act of domestic violence ...." The statute further provides that "[a] tenant ... to whom this Section applies shall be discharged from liability for rent or use and occupancy for 30 days or until I full rental period after the quitting date, whichever last occurs, to the extent that a rental agreement and applicable law may otherwise impose such liability " G.L. c. 186, § 24©. The parties do not dispute that G.L. c. 186, § 24 unmistakably precluded AKG from holding Ms. Dorrance liable for rent shortfalls and lease penalties following her termination of the tenancy for documented domestic violence. To the extent a handful of communications from Mr. Goldberg between July 21 and August 21 asserted an ongoing obligation on the part of Ms. Dorrance to make such payments to AKG, such communications were in error and inconsistent with the law. This, however, is as far as it goes.

The erroneous assertion of legal rights and responsibilities is coin of the realm in transactional dealings between non-lawyers. But Mr. Goldberg's cursory attempts to secure lease payments and other monetary remedies in circumstances foreclosed by G.L. c. 186, § 24 will not give rise to tort remedies in favor of Ms. Dorrance absent a clear legislative intent to provide a private right of action in the statute. See Loffredo v. Center for Addictive Behaviors. 426 Mass. 541, 543 (1988) (legislative intent is the "determinative factor in deciding whether a private cause of action can be implied from a statute"); Juliano v. Simpson, 461 Mass. 527, 531 (2012) ("Where ... a statute makes no express provision for a private right of action, legislative intent determines whether a private right may be  inferred.").  Chapter 186, however,  evidences  no  intent to provide for a private right of action for damages. It merely recites the right of tenants who

-7-

suffer domestic violence to terminate their leases without financial consequence. Making the point crystal-clear, G.L. c. 186, § 27 provides that "the superior court, housing court, district court and Boston municipal court shall have jurisdiction in equity to restrain violations of sections 23-26, inclusive." As in Section 24, there is no reference in Section 27 to the availability of legal remedies such as money damages. Under the principle of "express io unius est exclusio alterius" the statute's failure to provide a damage remedy when it expressly made provision for equitable remedies must be considered a reflection of the Legislature's intent. See Salvas v. Wal- Mart Stores. Inc.• 452 Mass. 337,373 (2008) (legislature's "specific provision of a private right of action for certain other sections of [the statute] weighs heavily against recognizing a private right of action" in subject section).

Further reinforcing this interpretation of Section 24 is the text of Section 26 of the statute. Section 26 explicitly provides for "actual and consequential damages ... and the costs of the action, including  reasonable  attorney's fees,"  in the event of a landlord's bad faith prevention of a tenant's changing of a unit's locks where there is an "imminent threat of domestic violence." In Section 26, therefore, the Legislature demonstrates that it knows how to provide for tort remedies in favor of tenants who have been victims of domestic violence in those particular circumstances where such remedies are intended. In light of the foregoing, the only reasonable conclusion to be drawn from the statute's failure to provide for tort remedies in Section 24 is that the Legislature neither intended nor authorized a private damages cause of action for general violations of that section. See Transamerica Mtge. Advisors. Inc. v. Lewis, 444 U.S. 11, 19 (1979) ("[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."). Summary judgment, therefore, shall enter in favor of the Defendant on Count I.

2. Violation of G.L. c.931 § 49 (Count II)
      
In Count II of the Complaint, Plaintiff asserts that AKG's attempts between July 21 and August 21, 2020 to secure both rent deficiencies (due to the inability to cover its full lease rate with a successor tenant) and termination-related penalties from Ms. Dorrance constitute violations of Massachusetts' Unfair Debt Collection statute, G.L. 93, § 49. To the extent that Mr. Goldberg sought and/or threatened to collect money that would be due to AKG if Plaintiff · terminated her tenancy, when G.L. c. 186, § 24 in fact invested Ms. Dorrance with a right to do so without penalty on account of the recent domestic violence she suffered, it is argued, AKG committed an unfair and deceptive debt collection practice. See G.L. c. 93, § 49(a); 940 Code Mass. Regs. § 7.07(2).
      
The Court will abjure extended discussion of whether the evidence permits a reasonable inference that AKG in fact violated the statute in the manner alleged. There are strong grounds for concluding that AKG was not, in Mr. Goldberg's communications, attempting to collect a "debt" as Massachusetts law defines the term. According to 940 Code Mass. Regs. § 7 .03, "[d]ebt means money or its equivalent which is, or is alleged to be, more than 30 days past due and owing, unless a different period was agreed to  by the debtor " Here, the subject communications from Mr. Goldberg (the last of which occurred on August 13, 2020) concerned money that Ms. Dorrance would owe at such time as she terminated her lease, an event that did not occur until August 31, 2020. AKG never actually attempted to collect money from Ms. Dorrance after she vacated the leased apartment on that date, and in fact acknowledged in writing to her lawyer on August 27, 2020 that it would not do so. However one characterizes Mr. Goldberg's communications with Ms. Dorrance, therefore,[1] they did not amount to attempts to

--------------------------------------------

[1] The parties further disagree as to whether Mr.Goldberg's communications reflect "knowingly false or misleading misrepresentations,"as required by law, 94C0ode Mass. Regs.§ 7.07(2), as opposed to innocent misstatements

-9-

collect a "debt"- that is, money "more than 30 days past due and owing"- as the same is defined under the Unfair Debt Collection statute.
      
Regardless of  whether the facts permit a reasonable inference that AKG violated the terms of the statute, however, Plaintiff's claim in Count II suffers a further flaw that is fatal to its viability as an independent cause of action. The Massachusetts Unfair Debt Collection Practices statute provides no private right of action. See Gabriel v. Wells Fargo Bank, N.A.• 453 F. Supp. 3d 478,483 (D. Mass. 2020); O'Connorv. Nantucket Bank, 992 F. Supp. 2d 24, 33 (D. Mass. 2014). Summary judgment shall, therefore, enter in favor of the Defendant on Count II.

3. Violation of Covenant of Quiet Enjoyment (Count Ill)

In Count III of the Complaint, Plaintiff asserts that AKG's demands for money if she terminated her lease "trapped her in the apartment in which she was abused" and otherwise caused her emotional distress. Plaintiff maintains that AKG thereby violated the Covenant of Quiet Enjoyment embodied by law in her tenancy. See G.L. c. 186, § 14. The Court does not agree.
      
General Laws c. 186, § 14 provides that a landlord may be liable where it "had motive or reason to know" of a condition interfering with a tenant's quiet enjoyment of the premises and the landlord acted with at least negligence in failing "to take appropriate corrective measures." Gorham v. Martins, 485 Mass. 54, 67 (2020). Chief Justice Gants summarized the doctrine of quiet enjoyment succinctly in Gorham, defining a violation of the covenant as "serious interference with [the] tenancy by acts or omissions that impaired the character and value of the

--------------------------------------------

by an unrepresented layperson. Although Mr. Goldberg makes reference to AKG's lawyer and even copies him on a transmittal, the facts appear to be in dispute as to whether Mr. Goldberg was in fact receiving legal advice prior to August 27, 2020. He would hardly be the first four-flusher in this regard.

-10-

leased premises." Id. at 68, quoting Doe v. New Bedford Hous. Auth.• 417 Mass. 272,285 (1994).

The facts of record in the present case permit no reasonable inference that AKG's conduct in the communications of Mr. Goldberg remotely approached this standard. Such communications were few in number, and respectful in language. The very most the evidence shows is that Mr. Goldberg stated on a few occasions that AKG intended to hold Ms. Dorrance to the financial terms of her lease agreement, contrary to other provisions of Massachusetts law (viz., G.L. c. 186, § 24) exempting her from such obligations if she chose to terminate her tenancy following reported domestic violence. No reasonable trier of fact could conclude that these communications amounted to an interference with Ms. Dorrance's tenancy in the leased premises so serious as to impair the essential character and value of the apartment.

Even if the facts somehow permitted such an inference, and they do not, there is no evidence in the record that AKG knew or had reason to know that Ms. Dorrance regarded the apartment's character and value as having been impaired to this extraordinary extent. To the contrary, all of Ms. Dorrance's communications with Mr. Goldberg expressed appreciation for his efforts on her behalf; and, once Lacey vacated the unit, Ms. Dorrance reported that "the apartment [felt] safe and positive." Indeed, far from ever informing AKG that the unit lacked quiet enjoyment, Ms. Dorrance advised Mr. Goldberg that her"'intent was to stay in the apartment." What Ms. Dorrance evidently wanted was to reduce the rent she was paying to her landlord to half its existing rate, a request Mr. Goldberg stated AKG was unwilling to accommodate. These facts plainly belie the suggestion that Mr. Goldberg's handful of economic demands communicated to Ms. Dorrance operated to divest the leased premises of their essential
value.

-11-

In sum, Mr. Goldberg may have been wrong in his asserted belief that Ms. Dorrance would be responsible for uncovered rent deficiencies and penalties in the event she terminated her lease with AKG; but this fact did not violate the statutory covenant of quiet enjoyment as that term is understood in the law. Summary judgment, therefore, shall enter in favor of the Defendant on Count III.

4. Violation of G.L. c. 93A (Count IV)

In Count IV of the Complaint, Plaintiff asserts that AKG's violations of G.L. c. 186, § 24 and G.L. c. 93, 49 amounted to "unfair and deceptive business practices," actionable under G.L. c. 93A, § 2. To determine whether a business practice is unfair or deceptive within the meaning of Chapter 93A, the Court must assess: "(I) whether the practice ... is within at least the penumbra of some common Jaw, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; [and] (3) whether it causes substantial injury." Barron. 469 Mass. at 811, quoting PMP Assoc's, Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975).

The existence of unfair or deceptive acts under G.L. c. 93A "must be determined from the circumstances of each claim." Markam v. Kubrick Offshore Fund, Ltd.• 442 Mass. 43. 61 (2004). In this regard, the Court focuses on the nature of the challenged conduct, as well as its purpose and effect. See Massachusetts Emp'rs lns. Exch. v. Propac-Mass., Inc.• 420 Mass. 39, 42-43 (1995). A "deceptive" act is one that is capable of causing a reasonable  person to act differently than they otherwise would have. See Aspinall v. Philip Morris Companies, Inc., 442 Mass. 381, 394 (2004), citing Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 767 (1980). Liability may be imposed if the deceptive conduct at issue attains "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Cimini v.

-12-

Nicola, No. 19-P-338, 2022 WL 2111634, *2 (Mass. App. Ct. June 13, 2022){Rule 23.0 decision), denied, 490 Mass. 1108 (2022), quoting Levings v. Forbes & Wallace, Inc., 8 Mass. Ap. Ct. 498,504 (1979).[2]
      
"Because c. 93A created new substantive rights by making conduct unlawful which was not unlawful under either common law or any prior statute ... the lawfulness of an underlying act or practice may not be a defense to a c. 93A claim." Herman v. Admit One Ticket Agency LLC, 454 Mass. 611, 616 (2009) (citations omitted). Liability may  thus sometimes rest on conduct that is neither tortious, nor a breach of contract, nor a violation of a statute. See Synergistics Tech., Inc. v. Putnam Investors, 74 Mass. App. Ct. 686, 689 (2009).

In the case at bar, and construing the evidence in the light most favorable to the Plaintiff, the Court is satisfied that the allegedly deceptive conduct ascribed to Mr. Goldberg-AKG's agent in dealing with tenants such as Ms. Dorrance - meets the standard herein above described. Regardless of whether G.L. c. 186, § 24 confers a private right of action, and regardless of whether G.L. c. 93, § 49 is violated by a landlord that seeks monetary amounts that do not strictly qualify as "debts," the fact remains that Mr. Goldberg persistently pursued Ms. Dorrance (over a one-month period) for payments that he knew or reasonably should have known would not be due and owing to AKG. That he did so by misstating the fact that AKG was then represented by supportive legal counsel, and by continuing to assert a demand foreclosed by a law of which any competently advised landlord would have been aware, falls within the penumbra of established concepts of unfairness and is at least arguably unethical and

--------------------------------------------

[2] The Supreme Judicial Court has recognized that the threshold for actionable deception will vary, depending upon the sophistication of the parties involved. "[A]n act might be unfair if practiced upon a commercial innocent yet would be common practice between two people engaged in business. In such circumstances, a claimant would have to show greater 'rascality' than would a less sophisticated party." Anthony's Pier Four. Inc. v. HBC Assocs., 411 Mass. 451, 475-76 (1991)(internal quotation and citation omitted).

-13-

unscrupulous. Perhaps the more so, given that Mr. Goldberg knew that he was dealing from a_ position of superior bargaining power (as landlord) with an emotionally vulnerable counterparty in Ms. Dorrance. The Court thus concludes that Plaintiff has stated a potentially viable claim under Chapter 93A.

That said, the undersigned observes that Chapter 93A requires a claimant to demonstrate "substantial injury" as a consequence of the Defendant's unfair and deceptive actions. See Barron, supra at 811. In this regard, the evidence does not appear to be very strong at all. There are no actual economic losses, inasmuch as Ms. Dorrance was ultimately able to quit her lease and vacate the premises without any financial consequence. Plaintiff's claimed emotional distress is a bit more difficult to untangle, particularly given the substantial other evidence (unrelated to conduct by AKG) to which Ms. Dorrance's psychic upset undoubtedly sources - viz., the domestic violence to which she was subjected and the end of her romantic partnership with Lacey. See Hershenow v. Enterprise Rent-A-Car Co. of Bos•. Inc., 445 Mass. 790, 798 (2006) (holding c. 93A permits  recovery for emotional distress even if consumer lost no money or property, if personal injury is causally connected to unfair or deceptive act). Focusing on the misstatements of Mr. Goldberg, the record reflects that Plaintiff was in the hands of landlord- tenant counsel by June 24, 2020, and acted at the direction of such counsel when she presented formal paperwork to AKG under the federal Violence Against Women Act. Less than a month later, Ms. Dorrance gave official notice of the termination of her lease in accordance with G.L. c. 186, § 24. It is true that from late July until late August, Mr. Goldberg attempted on several occasions to lead Ms. Dorrance to believe that a termination of her tenancy prior to the lease 's expiry would cause her to  incur  financial  obligations  to  AKG.  But  the  record  is  crystal-clear that Ms. Dorrance was fully aware by July 21, 2020 - at the latest - that AKG had no legal right to

-14-

demand money from her on account of a lease termination precipitated by domestic violence. She wrote this in perhaps colorful but unambiguous terms in a text to her sister-in-law, and shows no signs of ever having waivered in this understanding. There is thus no case to be made for detrimental reliance on a misrepresentation; and Ms. Dorrance's claim to severe emotional distress caused by her landlord - as opposed to the assaultive boyfriend from whom she required a Chapter 209A order of protection - is open to substantial doubt. The undersigned, however, will not prejudge such a question without a full evidentiary record, a matter that Chapter 93A reserves to the trial judge sitting in equity. Plaintiff's and Defendant's cross-motions for summary judgment, therefore, shall be denied as to Count IV.

5. Intentional Infliction of Emotional Distress (Count V)

The Court will not d we ll over-long on Plaintiff' s claim in Count V of the Complaint that Mr. Goldberg's misstatements about her continuing obligations under the lease will impute liability to AKG for intentional infliction of emotional distress. The claim lacks merit on its face.
      
To make out a clam for intentional infliction of emotional distress, Plaintiff must show "(1) that the defendant intended to inflict emotional distress or ... knew or should have known that emotional distress was the likely result of his conduct ... ; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and utterly intolerable in a civilized community ... ; (3) that the actions of  the  defendant were the cause of  [the  plaintiff's] distress ... ; and (4) that the emotional distress [she] sustained ... was severe." Howell v. The Enterprise Publishing Co., 455 Mass. 641,672 (2010) (quotations omitted). In the present case, and no matter how ungenerously construed, the conduct  of  Theodore Goldberg and  AKG  in insisting that Ms. Dorrance honor the financial terms of her  lease  does not approach  what  is required  to meet this standard. See Lanier v. President & Fellows of Harvard Coll., 490 Mass. 37, 48 (2022)

-15-

(intentional infliction tort requires conduct that is "extreme and outrageous"); Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976) (conduct must be "beyond all possible bounds of decency" and ''utterly intolerable in a civilized community").
      
Wholly apart from the other arguable deficiencies in Plaintiff's proof - e.g., evidence that AKG intended to cause her substantial harm[3] - the evidence of record simply will not sustain a finding that Mr. Goldberg's occasional demands for recompense from Ms. Dorrance under the
lease agreement constitute conduct that could be considered extreme, outrageous, and beyond all possible bounds of decency in a civilized society. Howell, 455 Mass. at 672. Summary judgment, therefore, shall enter in favor of the Defendant on Count V.

CONCLUSION AND ORDER

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment is DENIED in its entirety. The Defendant's Cross-Motion for Summary Judgment is ALLOWED as to Counts I, II, III and V of the Complaint, and DENIED as to Count IV of the Complaint.

SO ORDERED.

/s/Robert B. Gordon
Justice of the Superior Court

January 17, 2024

--------------------------------------------

[3] The cordial and for the most part supportive communications from Mr. Goldberg belie such malign intent, as do Ms. Dorrance's consistently appreciative replies to same.